UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kenneth Rose, et al.,                :          CASE C-1-02-271
          Plaintiffs                 :          (Dlott, J.)
                                     :          (Hogan, M.J.)
     vs.                             :
                                     :
Eric Davis, et al.,                  :
          Defendants                 :

---

## REPORT  AND  RECOMMENDATION

---

This matter is before the Court on Defendant Police Officers Eric Davis and Jeffery

Battison's Motion for Summary Judgment  (Doc. 29), Plaintiffs Kenneth Rose and Thomas

Seibert's Response in Opposition (Doc. 31), and Defendants Davis and Battison's  Reply in

Support (Doc. 32).

### FACTUAL BACKGROUND

This action arose from a confrontation between Plaintiff Kenneth Rose, his step-father

Plaintiff Thomas J. Seibert, and his brother Thomas K. Seibert and Defendant City of Cincinnati

Police Officers Eric Davis and Jeff Battison on Saturday, April 22, 2000.  Plaintiffs Kenneth

Rose and Thomas Seibert bring this action alleging a violation of their constitutional rights under

42 U.S.C. § 1983.

**I.      The Encounter Between Officer Davis and Mr. Rose.**

Plaintiff Rose owned a broken 1991 red Oldsmobile.  (Deposition of Kenneth Rose, at

20, Transcript of Criminal Proceedings at 10).  On Saturday April 22, 2000, Plaintiff Rose had

the car towed from another locale to his mother's and stepfather's residence on Elberon Avenue where he repaired the car. (*Id.* at 20-21). Plaintiff Rose resides at a downtown apartment, but the Seiberts allow their son to use their house as a second residence. (Deposition of Thomas J. Seibert, at 58-59). According to Plaintiff Seibert, Plaintiff Rose's step-father, Plaintiff Rose often uses the Seiberts' driveway and tools to work on his car. (*Id.* at 9, 58).

Plaintiff Rose took the car out for a drive to see if it would run. (Rose Dep. at 20). Plaintiff Rose knew that the car had expired tags. (*Id.*). Plaintiff Rose stated that he was wearing his seatbelt at all times. (*Id.* at 37). On the drive, Plaintiff encountered a friend, Mr. Michael Barkley. (*Id.* at 22). Mr. Barkley waved to Plaintiff Rose, who then pulled over to the right side of the street into a "no parking" area. (*Id.* at 23, 24). The two spoke for about 15 minutes as Plaintiff Barkley leaned into Plaintiff Rose's passenger side window. (*Id.* at 23, 25; Transcript of Criminal Proceedings ("Tr.") at 9). Plaintiff Rose left his engine running. (*Id.* at 27). After fifteen minutes, Plaintiff Rose saw a police officer walk out of a police district station located a block and a half way from him (*Id.* at 23-24).

Defendant Police Defendant Davis was leaving the station to start his "police overtime visibility detail, a walking beat on Warsaw Avenue." (Tr. at 8). Defendant Davis walked from the station to about 10 feet of Plaintiff Rose's car. (Rose Dep. at 24). Defendant Davis noticed that Plaintiff Rose did not have current tags on his car. When he ran the plate, Defendant Davis discovered that Plaintiff Rose's tags had been expired for about two years. (Tr. at 9).

Through his rearview mirror, Plaintiff Rose observed Defendant Davis walking from the station to about ten feet from the rear of his car. (Rose Dep. at 23-25, 28-29). Plaintiff Rose continued talking to Mr. Barkley for a several more minutes. (*Id.* at 26, 29). Finally, Plaintiff Rose told Mr. Barkley that "I think I better get on home, this car doesn't have plates and there is,

2

obviously, an officer back there." (*Id*. at 25-26).  Plaintiff Rose drove back to Plaintiff Seibert's residence.  (*Id*. at 26).

Defendant Davis testified that he approached the right passenger side of Plaintiff Rose's vehicle and told both Mr. Barkley and Plaintiff Rose either "[W]ait a minute, guys, I need to talk to you," or "[W]ait, I want to talk to you guys." (Tr. at 9, 10).  Defendant Davis made the statement while standing next to Mr. Barkley.  Defendant Davis then walked to the rear of the vehicle and began reading the plate number over his radio.  (*Id*. at 9).  At this point, Defendant Davis testified that Plaintiff Rose drove away, even as Defendant Davis issued a verbal command to Plaintiff Rose of either "Wait, wait, wait," "Wait," or "Stop." (*Id*. at 9, 17).  Defendant Davis ran after Plaintiff Rose's car until the next intersection and then put out the description of Plaintiff Rose and his car over the radio.  (*Id*. at 9).  Defendant Davis testified that Plaintiff Rose was not wearing his seatbelt during the encounter.  (*Id*. at 12).

## II.    Defendant Battison Enters the Seibert Home and Arrests Plaintiff Rose

Upon arriving at Plaintiff Seibert's house, Plaintiff Rose backed into the driveway and parked his car.  (Rose Dep. at 33).  Plaintiff Rose stated that he took his seat belt off and opened the car door.  (*Id*. at 36). He then observed a police cruiser coming down the street and pull up without lights or sirens.  (*Id*.).  Plaintiff Rose saw Defendant Battison jump out of his car and heard him say "[S]ir, get back into your car." (*Id*.).  Plaintiff Rose, however, decided to enter the house.  (*Id*. at 37).  Plaintiff Rose knew that his brother and father were home, but he did not encounter them upon entering the house and going down into the basement.  (*Id*. at 44).

In response to Defendant Davis' radio message, Defendant Battison, drove  to a street near where Defendant Davis believed Plaintiff Rose was traveling.  (Tr. at 22-23).   Defendant Battison saw a car described by Defendant Davis backing up into the Seibert's driveway.  While

3

Plaintiff Rose was getting out of his car, Defendant Battison said "Stop, you're under arrest" to Plaintiff Rose, but Plaintiff Rose fled into the house through a back door. (*Id.* at 23, 24). Defendant Battison stated that the only thing he knew about Plaintiff Rose when he arrived at the Seibert residence was that "an officer on foot left a traffic stop and the vehicle fled from him." (*Id.* at 26-27).

Defendant Battison testified that after Plaintiff Rose ran into the house, he went up to the front corner of the house where he could observe both the back and the front doors. (Tr. at 24). He then put out the Seiberts' address on the radio to obtain assistance from other officers. (*Id.* at 25).

Plaintiff Seibert was in the house on the second floor when Plaintiff Rose entered the house. (Seibert Dep. at 8). Plaintiff Seibert was about to take a nap when his son, Tommy,[1] entered his room on the second floor and asked Plaintiff Seibert if he heard that someone had just entered the house. (*Id.*). Plaintiff Seibert followed Tommy down the steps to the front door and encountered Defendant Battison walking up the front steps. (*Id.* at 9, Tr. at 25). According to Plaintiff Seibert, Defendant Battison first asked Plaintiff Seibert "[W]ho just ran in your house?" (Seibert Dep. at 9). Plaintiff Seibert replied that he "had no idea what [Defendant Battison] was talking about." (*Id.* at 9). Defendant Battison then said, "[S]omebody just got out of that red car and ran in your house." (*Id.*). Plaintiff Seibert responded "[W]ell, I'm sorry I don't know anything about that," but he invited Defendant Battison into the house either vocally or by signal. (*Id.* at 9, 10).

Plaintiff Seibert recognized Plaintiff Rose's car on the driveway. (*Id.* at 9). Plaintiff Seibert then said that he called for Plaintiff Rose. (*Id.* at 14). He went to the top of the basement

---

[1] Plaintiff Thomas K. Seibert, Plaintiff Rose's brother, will be referred to as "Tommy" for purposes of distinguishing him from Plaintiff Thomas J. Seibert, Plaintiff Rose's step-father.

steps and called for Plaintiff Rose again, but Plaintiff Rose did not answer. (*Id*.). Plaintiff Seibert asked Tommy to go into the basement to look for Plaintiff Rose. (*Id*.). He said that Tommy came up the steps and asked Defendant Battison if he had a warrant. Plaintiff Seibert told Tommy to "Shut up," for "mouthing off to a police officer." (*Id*.). At the same time, Defendant Battison said "we can do that if you want . . . but right now all he's looking at is a couple of tickets." (*Id*. at 15). Plaintiff Rose heard Defendant Battison make these statements as well. (Rose Dep. at 44-45). Plaintiff Seibert says he then signaled for Defendant Battison to go down the basement steps. (Seibert Dep. at 15).

Defendant Battison describes his encounter with Plaintiff Seibert and Tommy a bit differently. Defendant Battison says he described Plaintiff Rose to Plaintiff Seibert and Tommy. Then Plaintiff Seibert said that Defendant Battison was probably looking for his stepson. (Tr. at 25). Plaintiff Seibert gave Defendant Battison permission to enter the house and allowed him to look around. (*Id*. at 27). Defendant Battison denied that anyone directed him to the basement. Instead, he went to the basement because he "just thought that [Plaintiff Rose] might be there." (*Id*.). Defendant Battison admits that he told Plaintiff Seibert "that if he wanted us to get a search warrant that we could do that." (*Id*. at 30). Plaintiff Seibert replied "that wouldn't be necessary" to Defendant Battison. (*Id*. at 31). Defendant Battison did not clearly state whether or not he also told Plaintiff Seibert that Plaintiff Rose "was just looking at a couple of traffic tickets."[2]

According to Plaintiff Rose's deposition testimony, Defendant Battison came down the stairs into the office on the right where Plaintiff Rose was standing. (*Id*. at 61). Plaintiff Rose

---

[2]The testimony from Plaintiff Rose's Criminal Trial is as follows:
Q. When Plaintiff Rose's brother asked you do you have a search warrant. Didn't you reply to him, "We can take that route too, if you want to? Right now, you're just looking at a couple of traffic tickets"?
A. No, I believe I told him that - - I was actually talking to the father, not him. If he wanted us to get a search warrant that we could do that. So yes, I did say that.

began to explain the reasons for his actions to Defendant Battison. (*Id*.). Defendant Battison told Plaintiff Rose that he was under arrest. (*Id*.). Then Defendant Battison "began to grab or twist [Plaintiff Rose] and grab [his arms]." Defendant Battison threw Plaintiff Rose onto a desk and tried to push him down while Plaintiff Rose struggle to stay upright. (*Id*. at 61-62). Plaintiff Rose admits that he used his back muscles to try to rear up as Defendant Battison was pushing him down. (*Id*. at 66).

Though Defendant Battison had secured his arms, Plaintiff Rose said he was not trying to pull his arms away from Defendant Battison. (*Id*. at 62). Plaintiff Rose says that he wanted to let Defendant Battison handcuff him, but that he instinctively wanted to stand up. (*Id*. at 67).

Throughout the confrontation, Plaintiff Rose says that he kept asking Defendant Battison "For what?" and Defendant Battison would reply either "You're under arrest" or "Quit resisting or I'm going to mace you." (*Id*. at 61-62). Defendant Battison kept trying to push Plaintiff Rose down to the desk while saying "You're under arrest." (*Id*. at 62). Plaintiff Rose says that then Defendant Battison "warns me again to quit resisting or he's going to mace me, and again I say for what, and then here comes the mace in my face." (*Id*. at 63). After he was maced, Plaintiff Rose says that he "kind of bent over a the desk and [Defendant Battison] still has my arms and puts the handcuffs on, and now I'm saying why did you mace me, why did you mace me." (*Id*.). At some point during the confrontation, Plaintiff Rose heard Plaintiff Seibert tell him to cooperate with the officer. (*Id*. at 68). Plaintiff Rose did not sustain physical injuries as result of the confrontation. (*Id*. at 76).

Plaintiff Seibert followed Defendant Battison down the steps and observed Defendant Battison and Plaintiff Rose begin to scuffle. (Seibert Dep. at 19). Plaintiff Seibert heard Plaintiff Rose say "What are you doing, what are you doing." (*Id*.). Then Plaintiff Seibert saw Defendant

6

Battison spin Plaintiff Rose around, push Plaintiff Rose against a desk, and "even as he had handcuffs on him he sprayed mace in his face." (*Id.*).

Plaintiff Seibert gives conflicting testimony as to whether Defendant Battison handcuffed Plaintiff Rose first or maced Plaintiff Rose first. Plaintiff Seibert admits that he did not see Defendant Battison actually spray the mace, but only saw the results. (*Id.* at 29, 30). Additionally, Plaintiff Seibert states that "the officer might have sprayed the mace along with the action of spinning him around to put -- I don't know how all that works, I've never had it done." (*Id.* at 29). Finally, Plaintiff Seibert affirmed that he did not remember whether Defendant Battison sprayed the mace before or after he handcuffed Plaintiff Rose. (*Id.* at 32). Plaintiff Seibert acknowledges that the basement room was dimly lit – the lights were off and the only light source was a window admitting daylight. (*Id.* at 33).

Defendant Battison testified that he went into the basement and saw Plaintiff Rose in the computer room on the right side of the stairs. (Tr. at 28). Defendant Battison denies that Plaintiff Rose asked him why he was under arrest. (Tr. at 28). Instead, Defendant Battison says Plaintiff Rose only said "get my f–ing hands off of [me]." (*Id.*). However, Defendant Battison does state that Plaintiff Rose did not try to get away from him. (*Id.*). After issuing several warnings, Defendant Battison maced and arrested Plaintiff Rose. (*Id.*).

After Plaintiff Rose was handcuffed and subdued, Defendant Battison used his radio to report that Plaintiff Rose was in custody and then guided Plaintiff Rose up the stairs and out of the house. (Rose Dep. at 68-69). Plaintiff Rose noted that there were several other police officers in the house when he came upstairs. (*Id.* at 69). Plaintiff Rose was escorted out of the house. He asked to speak to a supervisor, but all he could say to the supervisor was "Why did you mace me"? (*Id.*). Then Plaintiff Rose was placed in the back of a police car. (*Id.*).

### III.     The Impoundment of Plaintiff Rose's Car.

Defendant Davis arrived at the Seibert residence and approached the police cruiser containing Plaintiff Rose.  Defendant Davis wrote up a citation for an expired registration.  (Tr. at 19-20; Rose Dep. at 71).  Another police officer came up to the cruiser and asked Defendant Davis whether Plaintiff Rose should be charged with a "seat belt." (Rose Dep. at 71).  Plaintiff Rose said Defendant Davis told the other officer to "write him up for seat belt." (*Id*. at 71-72).  Plaintiff Rose then said that Defendant Davis, or one of the other police officers, decided to impound Plaintiff Rose's red Oldsmobile because "he was parked on Warsaw with tags over 30 days." (*Id*. at 72).

Plaintiff Seibert stated that while he was standing outside after Plaintiff Rose was taken to the police cruiser, a police officer "came up and told my son, Tommy, to put that car down on the street, and Tommy did what they said." (Seibert Dep. at 50).

Defendant Davis says that he had Plaintiff Rose's car towed off of the street.  (Tr. at 17).  Defendant Davis said that either Officer Beasley or Defendant Battison may have spoken to Plaintiff Rose's father or brother about moving the car.  (*Id*. at 17-18).  Defendant Davis said "I had the car towed off the street.  It was in his father's driveway. And I don't recall who moved it out of the driveway, but it was on the city street with expired plate." (*Id*. at 17). Defendant Davis did not "recall who moved the vehicle from the driveway to the street" because he was busy talking to Plaintiff Rose at the time.  (*Id*. at 18).  Defendant Battison states that he took part in the impounding of Plaintiff Rose's car.  (*Id*. at 29).

Defendant Davis testified that he had the vehicle impounded because of the expired tags.  Defendant Davis noted that "[a]nything over 30 days can be impounded and [Plaintiff Rose] was on a city street operating a motor vehicle with tags that were I believe almost two years expired."

(*Id*. at 19).  However, Defendant Battison stated that a police officer would not impound a vehicle if the "vehicle was parked in a driveway initially." (*Id*. at 30).

On April 22, 2000, Defendant Davis cited Plaintiff Rose with safety restraints violation (ORC § 4513.263(B)(1)), expired license plates (Cincinnati Municipal Code 503.52), and Disregarding a Police Officer's Signal (CMC 502.9). (Plaintiff's Complaint, Doc. 1 at ¶ 20).  At a bench trial before Judge Stockdale, Plaintiff Rose was acquitted of Disregarding a Police Officer's Signal and Resisting Arrest on a Rule 29 Motion. (Tr. at 37).  However, Judge Stockdale denied Plaintiff Rose's  Rule 29 Motion as to the failing to follow a police officer's signal charge. (*Id*. at 37).  Plaintiff Rose pled no contest to expired license plates; in return the State dismissed the seatbelt violation. (*Id*. at 37; Doc. 1 at ¶ 21).

## PROCEDURAL BACKGROUND

On April 19, 2002, Plaintiffs Rose and Seibert filed a complaint in the United States District Court for the Southern District of Ohio alleging that Defendant Davis, Defendant Battison, and John Does I-XX Police Officers, in their official and individual capacities, violated 42 U.S.C. § 1983 by infringing upon  Plaintiff Rose's fourth amendment rights to be free from unreasonable searches and seizures, Plaintiff Rose's fourth amendment right to be free from the use of excessive force in during an arrest, Plaintiff Seibert's right to be free from unreasonable searches and seizures of his property. (Doc. 1 at ¶ 1).  Plaintiffs also brought state tort claims of negligent infliction of emotional distress and intentional or reckless infliction of emotional distress for the entry into the Seiberts' house, the arrest and macing of Plaintiff Rose.  Plaintiffs did not bring state law claims based on the seizure of Plaintiff Rose's car.

The Defendants claim that Plaintiff Seibert has now withdrawn from this suit as a plaintiff. (Doc. 29 at 5).  However, this Court has not received a notice of dismissal from

9

Plaintiff Seibert.  Therefore, this Court will consider the defendant police officers' Motion for

Summary Judgment as it applies to Plaintiff Seibert.

## OPINION

A motion for summary judgment should be granted if the evidence submitted to the court

demonstrates that there is no genuine issue as to any material fact and that the movant is entitled

to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving

party must demonstrate the absence of genuine disputes over facts which, under the substantive

law governing the issue, could affect the outcome of the action.  *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is

required to present some significant probative evidence which makes it necessary to resolve the

parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d

1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989).  The non-moving

party must show more than a "mere scintilla of supporting evidence." *Livingston Care Ctr. v.*

*Dep't of HHS*, 388 F.3d 168, 173 (6th Cir. 2004) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1477 (6th Cir. 1989).  Furthermore, "if the evidence is merely colorable or is not

significantly probative summary judgment may be granted." *Id.* (citing *Anderson*, 477 U.S. at

249-50).

The trial judge's function is not to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at

249-50.  The court must determine "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law." *Anderson*, 477 U.S. at 251-52.  In making this determination, the "court must view the

10

facts and all the inferences drawn from such facts in the light most favorable to the nonmoving party." *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004) (citing *Sixty Ivy St. Corp.*, 822 F.2d at 1435).

If, after an appropriate time for discovery, the opposing party is unable to demonstrate the presence of a genuine issue of material fact, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex*, 477 U.S. at 327, 106 S. Ct. at 2555). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A trial court "must apply 'less stringent standards' in determining whether pro se pleadings state a claim for which relief can be granted . . . ." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))). However, pro se plaintiffs still must meet "basic pleading essentials." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) (collecting cases).

<u>QUALIFIED IMMUNITY</u>

In their Motion for Summary Judgment, Defendants assert that they are entitled to qualified immunity from suit because the officers "reasonably believed in good faith that [their] actions were constitutional and that their conduct, from an objective standpoint was reasonable." (Doc. 32 at 7).

Government officials, including police officers, "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Radvansky v. City of Olmsted Falls*, 2005 U.S. App. LEXIS 739 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity insulates

11

government officials from individual liability for money damages. *See e.g., Cagle v. Gilley*, 957 F.2d 1347, 1350 (6th Cir. 1992).

"Discretionary functions," as used in evaluating claims of qualified immunity, involve "significant decision-making that entails personal deliberation, decision and judgment." *Davis v. Holly*, 835 F.2d 1175, 1178 (6th Cir. 1987). By contrast, "ministerial functions," for which there is no immunity, involve "the execution or implementation of a decision and entail only minor decision-making." *Id.*

Once a defendant police officer raises a qualified immunity defense, the plaintiff must satisfy a two pronged analysis: (1) do the facts taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) as taken in the specific context of the case, was the constitutional right clearly established? *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

A constitutional right is "clearly established," thereby precluding the application of qualified immunity, if "the law [is] clear in regard to the official's particular actions in the particular situation." *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993) (quoting *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir.), *cert. denied*, 502 U.S. 863 (1991)). *See also Mackey v. Dyke*, 29 F.3d 1086, 1094 (6th Cir. 1994), *cert. denied*, 522 U.S. 848 (1997). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Black*, 4 F.3d at 445 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The official, therefore, will be immune "if officers of reasonable competence could disagree" on whether his conduct violated the plaintiff's rights. *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Malley v. Briggs* , 475 U.S. 335, 341 (1986)).

I.      **Defendant Police Defendant Davis' "Stop" of Plaintiff Rose**

12

In their Motion for Summary Judgment, the Defendants state that they are not sure whether or not Plaintiffs allege that Defendant Davis' "attempt to stop Plaintiff Rose" was a constitutional violation. (Doc. 29 at 8). Plaintiffs do allege that defendant police officers engaged in unconstitutional conduct "by taking part in an unconstitutional traffic citation." (Doc. 1 ¶ 5). The actual citation of Plaintiff Rose occurred at Plaintiff Seibert's residence, after Plaintiff Rose fled the scene. This allegation may or may not refer to the "stop" of Plaintiff Rose. For purposes of analysis, the Court will assume that Plaintiffs properly allege that Defendants violated Plaintiff Rose's constitutional rights by unconstitutionally seizing Plaintiff Rose during the traffic stop.

A traffic stop is a seizure within the meaning of the fourth amendment even when the detention of the occupants of the car is brief. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). After a traffic stop, a police officer may subsequently detain a suspect for questioning, if the detention is not overly intrusive. *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996). Such a temporary detention "does not require a showing of probable cause if it is justified by specific and articulable facts that give rise to a reasonable suspicion of criminal activity. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

Assuming that Plaintiffs allege that Defendant Davis' "stop" of Plaintiff Rose violated Plaintiff Rose's constitutional right to be free from unreasonable seizure, Defendant Davis is entitled to qualified immunity because he did not violate Plaintiff Rose's constitutional rights during the "stop." Defendant Davis first exited the police station, approached Plaintiff Rose's car, observed the expired tags, and determined that they had been expired for two or more years. Then Defendant Davis came within a close distance of the front passenger window that Plaintiff Barkley was leaning into and said "[W]ait a minute, guys, I need to talk to you," or "[W]ait, I want to talk

13

to you guys." (Tr. at 9, 10). Then Plaintiff Rose drove off, either ignoring Defendant Davis' request or without hearing Defendant Davis' request.

Plaintiffs argue that there is reasonable doubt as to whether Plaintiff Rose heard Defendant Davis. (Doc. 31 at 2). Whether or not Plaintiff Rose heard this statement is immaterial. Defendant Davis was well within constitutional boundaries when he spoke with Plaintiff Rose during the "stop." Plaintiff Rose violated Cincinnati Municipal Code provision § 503-52 with respect to unauthorized license plates. [3] Therefore, Defendant Davis was entitled to speak with Plaintiff Rose about the traffic citation that he was authorized to deliver to Plaintiff Rose.

Furthermore, if during his conversation with Plaintiff Rose, Defendant Davis had gained reasonable suspicion of further criminal activity, Defendant Davis could have detained Plaintiff Rose to speak with him about whatever circumstances gave Defendant Davis reasonable suspicion. This encounter never reached that outer boundary of a constitutionally permissible police/citizen encounter clearly established in 1968 by *Terry*. Plaintiff Rose drove off before Defendant Davis even delivered the traffic citation. Since Defendant Davis' actions were constitutional, he is entitled to qualified immunity as to any claim by Plaintiffs that Defendant Davis unconstitutionally seized Plaintiff Rose during the traffic stop.

## II. Defendant Police Defendant Battison's Entry into Plaintiff Seibert's House

Defendants argue that Defendant Battison is entitled to qualified immunity as to Plaintiff Seibert's claim that he suffered a warrantless entry of his house and an unreasonable search and seizure of his house. In their Complaint, Plaintiffs allege that Defendants made a warrantless and unreasonable search and seizure of Plaintiff Seibert's residence. (Doc 1 at ¶ 5, 8).

_____

[3] This provision states in part: "No person who is the operator of any vehicle upon which license plates are required to be displayed by law shall fail to display on the front and rear of such motor vehicle the distinctive number and registration mark, including any required validation sticker, required by law.

A.    Constitutional Right to be Free From Unreasonable Searches

The Fourth Amendment secures the right of people to be free from unreasonable searches and seizures of homes.  There are limitations on this protection - a police officer may enter a home without a warrant when the owner consents to the police officer's entry.  *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  However, consent cannot be coerced, by either "explicit or implicit means," or by "implied threat or covert force."  *Schneckloth*, 412 U.S. at 228.

If law enforcement officers undertake a warrantless search based on consent, "the scope of the consent given determines the permissible scope of the search."  *United States v. Hurst*, 228 F.3d 751, 758 (6th Cir. 2000) (citing *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997)).  In order to determine the scope of consent given, the court must determine the objectively reasonable level of the scope of consent or "what would the typical reasonable person have understood by the exchange" between the officer and the person giving the consent.  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citing *Rodriguez*, 497 U.S. at 183-189; *Florida v. Royer*, 460 U.S. 491, 501-02, (1983) (opinion of White, J.); *id.*, at 514 (Blackmun, J., dissenting).  However,  consent may be voluntary even when the consenter had no knowledge of the right to refuse consent.  Instead, a court must examine the circumstances of a consent to "ascertain[] whether in fact it was voluntary or coerced."  *Schneckloth*, 412 U.S. at 232-233 (1973).  When making this determination, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."  *Schneckloth*, 412 U.S. at 229 (1973).

When Defendant Battison approached the front door, Plaintiff Rose's stepfather and stepbrother came out the front door.  Defendant Battison asked Plaintiff Seibert who just ran into the house.  Then Plaintiff Seibert gave Defendant Battison general consent to enter his house to

look for Plaintiff Rose, either vocally or by signal.  (Seibert Dep. at 9, 10; Tr. at 27).  Plaintiff

Seibert had authority to grant consent to Defendant Battison to enter his house.  Plaintiff Seibert

did not place any express limitations on the scope of his consent.

Once the group of Defendant Battison, Plaintiff Seibert and Tommy reached the staircase

to the basement, Plaintiff Seibert sent Tommy down the stairs to go look for Plaintiff Rose.

Tommy came up and asked Defendant Battison if he had a search warrant.  Both parties agree that

Defendant Battison said "we can do that if you want" and that Plaintiff Seibert either vocally or

by gesture told Defendant Battison to proceed down the stairs.  The parties dispute whether

Defendant Battison may have told Plaintiff Seibert "but right now all he's looking at is a couple of

tickets" before Plaintiff Seibert gave Defendant Battison permission to go down the stairs.  (Doc

31 at 3; Doc 32 at 2).  The trial testimony of Defendant Battison is unclear as to whether or not he

said "but right now all he's looking at is a couple of tickets" to Plaintiff Seibert.  However, both

Plaintiffs stated in their deposition testimony that Defendant Battison stated this.  (Seibert Dep. at

15; Rose Dep. at 44-45).  Since this question is before the Court on Defendants' motion for

summary judgment, the Court will assume that Defendant Battison made this statement.

At this point, the only charges Plaintiff Rose faced were violation of CMC § 502-3, for

failure to follow a the signal of a police officer with authority to "direct, control or regulate

traffic," the lack of safety restraints violation, and the unauthorized license plates violation.  All

three of these offenses are traffic ordinance violations.  The factual circumstances surrounding the

resisting arrest charges had not yet arisen.  Therefore, Defendant Battison did not deceive Plaintiff

Seibert in stating that "but right now all he's looking at is a couple of traffic tickets."  However,

Plaintiff Seibert may not have known that Defendant Battison was planning on arresting Plaintiff

16

Rose, as he was lawfully entitled to do under Ohio Rev. Code Ann. § 2935.03(A)(1).[4] Arguably, Defendant Battison deceived Plaintiff Seibert by failing to state that he was planning on arresting Plaintiff Rose before Plaintiff Seibert allowed Defendant Battison to enter the basement.

In consent by deception cases, the constitutionality of the search depends on whether consent was given because of the "fact as represented by the officer." The consenter must rely "on the representation; but for misrepresentation, consent would not have been given. *United States v. Maudlin*, 754 F.2d 376 at *7-8 (6th Cir. 1984).

In this case, even if Defendant Battison deceived Plaintiff Seibert in failing to mention the impending arrest of Plaintiff Rose, this misrepresentation was not material. When viewed in the light most favorable to Plaintiff Seibert, the facts indicate that Plaintiff Seibert would have allowed Defendant Battison to enter the basement despite Defendant Battison's statement. Plaintiff Seibert unconditionally allowed Defendant Battison to enter his house to search for the suspect, realizing that Plaintiff Rose most likely was the suspect. (Seibert Dep. at 9). Plaintiff Seibert called for Plaintiff Rose twice; thereby actively aiding Defendant Battison's search. (Seibert Dep. at 14). Plaintiff Seibert allowed Defendant Battison to proceed knowing that he did not have a search warrant.[5] (Seibert Dep. at 15; Rose Dep. at 44-45; Tr. at 30). Plaintiff Seibert stated that Defendant Battison entered Plaintiff Seibert's house with his permission, that he never revoked his consent to Defendant Battison, and that Defendant Battison did not unlawfully enter his house. (Seibert Dep. at 57, 58).

---

[4] Ohio Rev. Code Ann. § 2935.03(A)(1) provides that a "municipal police officer . . . shall arrest and detain, until a warrant can be obtained, a person found violating, within the limits of the political subdivision . . . a law of this state, an ordinance of a municipal corporation, or a resolution of a township. The Supreme Court has upheld the validity of laws allowing policy officers to arrest persons who commit minor misdemeanors. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

[5] Neither party suggests that Defendant Battison's statement that he could get a search warrant was meant to be a threat.

Plaintiff Seibert spoke about his sense of respect for the police at the time of this incident. (Seibert Dep. at 37). Plaintiff Seibert explained that he was likely to simply comply with requests made by police officers. (Seibert Dep. at 38). If a police officer said "Jump," Plaintiff Seibert believed the appropriate response to be "How high sir"? (Seibert Dep. at 34, 56). Most notably, Plaintiff Seibert said:

> When a police officer comes up my front stops, it would just be a matter of nature to . . . invite him in. If there was anything illegal, I think it's when the police officer went way way beyond what he said his purpose was of giving him a couple of tickets, and spinning him around and spraying mace in his face, and cuffing him and taking him out and taking his car away.

(Seibert Dep. at 56-57).

Plaintiff Seibert has a commendable respect for the law. In fact, his deposition remarks to this effect leave the Court with no doubt that Plaintiff Seibert would have allowed Defendant Battison to proceed down the stairs even if he knew that Defendant Battison was planning on arresting Plaintiff Rose in addition to citing Plaintiff Rose for traffic violations. However, Defendant Seibert specifically states that he believes that the police were entitled to give Plaintiff Rose traffic tickets, but were not entitled to spin Plaintiff Rose around, spray him with mace, cuff him, and remove his car. (*Id.*). Therefore, a factual issue remains as to whether Plaintiff Seibert would have allowed Defendant Battison to enter his basement if he had known that Officer Battison was going to do anything other than ticket Mr. Rose from traffic violations. The jury must decide whether or not there was a deception and if the deception was material.

B.   Reasonableness of Defendant Battison's Search of Plaintiff Seibert's Residence

Since the Court decided that there is a factual issue as to whether Defendant Battison violated Plaintiff Seibert's constitutional right to be free from unreasonable searches, the analysis

18

moves to the second part of the qualified immunity inquiry as the Court must determine whether "in the specific context of th[is] case, [is] the constitutional right clearly established"? *Dunigan*, 390 F.3d at 491 (6th Cir. 2004) (citing *Saucier*, 533 U.S. at 201).

      *Maudlin*, a case briefly cited *supra,* was decided by the Sixth Circuit in 1984. In *Maudlin*, the court gathered cases from other Federal Circuit Courts of Appeals and used this case law to determine that a consenter must rely "on the representation; but for misrepresentation, consent would not have been given. *Maudlin*, 754 F.2d 376 at *7-8. However, *Maudlin* itself is not on point factually because that case addresses an instance in which the consenter was not, as in this instance, an innocent party. *Id*. at *1-2. Another Sixth Circuit case decided after *Maudlin* suggests that a police officer is entitled to qualified immunity for unreasonable searches when the police officer fails to tell a consenter that they are planning on arresting a person within the house. *Masten v. Jackson County*, 1998 U.S. App. LEXIS 30606, at *9-10 (6th Cir. 1998). In *Masten* the police went so far as to tell the third party consenter who owned the house that they just wanted to talk with the woman within the house and that this person was not in trouble, when the police officers actually arrested the woman. *Id*. at *3-4.

      This Court believes that a consent gained by either express deception or by deception by omission of a material fact violates the constitutional right of the consenter to be free from unreasonable searches. However, the Sixth Circuit case most on point, *Masten*, suggests that this behavior can be constitutional. Therefore, the Court cannot say that Defendant Battison's behavior in obtaining consent to proceed down the stairs was clearly unconstitutional. Thus, we find that Defendant Battison is entitled to qualified immunity as to Plaintiff Seibert's claim that Defendant Battison illegally searched his house in violation of the fourth amendment.

### III.   Defendant Police Defendant Battison's Seizure of Plaintiff Rose

Defendants next seek summary judgment as to Plaintiff Rose's unlawful seizure claim,

arguing that Defendant Battison is entitled to qualified immunity.  (Doc. 29 at 13).

An arrest made "without probable cause violates the Fourth Amendment."  *Klein v. Long*,

275 F.3d 544, 550 (6th Cir. 2001), *cert denied*, 537 U.S. 819 (2002) (citing *Donovan v. Thames*,

105 F.3d 291, 297-98 (6th Cir. 1997)).  The Fourth Amendment permits a police officer "to effect

a custodial arrest of someone for a misdemeanor parking violation" even if violation is only

punishable by a fine.  *United States v. Burton*, 334 F.3d 514, 518 (6th Cir. 2003), *cert denied*, 540

U.S. 1135 (2004) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)).  In *Atwater*, the

Supreme Court expressly declined to decide whether the police officer had to personally observe

the traffic violations.  The Sixth Circuit has determined that the Constitution does not require that

the misdemeanor occur in the presence of the police officer in order for that police officer to make

a warrantless arrest of the person. Straub v. Kilgore, 100 Fed. Appx. 379, 383 2004 U.S. App.

LEXIS 10668, at **9 (6th Cir. 2004) (citing *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).

Even though *Atwater* was decided a year after this incident occurred, the Sixth Circuit had already

determined that a suspect who commits a misdemeanor does not have a constitutional right not to

be arrested even when the arresting officer does not witness the misdemeanor crime. *Pyles*, 60

F.3d at 1215.  *See also United States v. Chapel*, 1997 U.S. App. LEXIS 7302, at *8-9 (6th Cir.

1997). Therefore, we find that Defendant Battison was constitutionally permitted to arrest Plaintiff

Rose if he had probable cause to believe that Plaintiff Rose committed traffic violations.

In this case, Defendant Battison's seizure of Plaintiff Rose passes constitutional muster.

Defendant Battison testified that when he arrived at Plaintiff Seibert's residence, he knew that

Plaintiff Rose fled from a police officer on foot patrol.  Plaintiffs disagrees with the assertion that

Plaintiff Rose fled from Defendant Davis, but do not contest the following facts: 1) Defendant

Battison's testimony that he heard Defendant Davis' radio broadcast reporting Plaintiff Rose fled

from the scene; 2) Defendant Davis released a description of Plaintiff Rose's car over the radio

and Defendant Battison heard that description; and 3) Defendant Battison knew about Plaintiff

Rose's traffic violations.  In fact, Plaintiffs use the fact that Defendant Battison knew about the

traffic violations when they contend that Defendant Battison told Plaintiff Seibert: "but right now

all he's looking at is a couple of tickets."  (Doc. 31 at 3).

      The fact that Defendant Battison did not personally observe the commission of the crime is

relevant to Defendant Battison's probable cause determination, but does not make the arrest

unconstitutional.  Defendant Battison reasonably concluded under the circumstances that he had

probable cause to arrest Plaintiff Rose because 1) Defendant Battison heard the information

radioed by Defendant Davis conveying the fact that Plaintiff Rose committed a traffic violation, 2)

Defendant Battison had the opportunity to observe Plaintiff Rose's car on Plaintiff Seibert's

driveway and determine that Plaintiff Rose's car matched Defendant Davis' description, and 3)

Plaintiff Rose fled from Defendant Battison when Defendant Battison told him to get back in the

car.  (Rose Dep. at 36).  Since Defendant Battison had probable cause to believe that Plaintiff Rose

committed misdemeanor traffic violations, he was constitutionally permitted to arrest Plaintiff

Rose following the guidance of *Pyles* and *Chapel*.  Consequently, Defendant Battison is entitled to

qualified immunity as to Plaintiffs' claim that the arrest of Plaintiff Rose was an unlawful seizure.

**IV.**     **Defendant Police Defendant Battison's Use of Force Against Plaintiff Rose**

      Defendants also move for summary judgment on Plaintiff Rose's  excessive force claim,

arguing that Defendant Battison is entitled to qualified immunity as to this claim.  Plaintiff Rose

alleges that Defendant Battison "exerted excessive force against Plaintiff Rose by spraying MACE, a chemical irritant, into his face at close range." (Doc 1 at ¶ 11; Rose Dep. at 63).

Claims of excessive force during arrest must be analyzed under the fourth amendment's prohibition against unreasonable seizures of the person, and its corresponding reasonableness standard. *Hancock v. Dodson*, 958 F.2d 1367 (6th Cir. 1992); *see also Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) and *Washington v. Newsom*, 977 F.2d 991, 994 (6th Cir. 1992), *cert denied*, 507 U.S. 1031 (1993). In evaluating a fourth amendment claim, "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Hancock*, 958 F.2d at 1374 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Walton*, 995 F.2d at 1342 (quoting *Graham*, 490 U.S. at 396)).

The fourth amendment reasonableness standard for excessive force claims and the test to determine whether a police officer is entitled to summary judgment on an excessive force claim overlap. However, the Sixth Circuit clarified the proper analysis to apply when a police officer moves for summary judgment on an excessive force claim on the grounds that the officer is entitled to qualified immunity:

> First, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right. If the answer is yes, the court must then decide whether the right was clearly established. The relevant, dispositive inquiry in determining whether a right is

22

clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation that he confronted.

*Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (citing *Saucier*, 533 U.S.

at 201-02 (2001)) (quotations and citations omitted).

     A.    <u>Constitutional Right to be Free From Excessive Force</u>

     First the Court will determine whether Defendant Battison's conduct in spraying the mace

could violate Plaintiff Rose's constitutional rights.  During an arrest, a person has a

"constitutional right to be free from excessive force" *Solomon v. Auburn Hills Police Dep't*, 389

F.3d 167, 173 (6th Cir. 2004) (quotations removed) (citing *Minchella v. Bauman*, 72 Fed. Appx.

405, 2003 WL 21957034, at **3 (6th Cir. 2003).  The Sixth Circuit "has expressed doubt that the

use of non-lethal force against an armed and volatile suspect constitutes excessive force."

*Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004) (citing *Ewolski v. City of Brunswick*,

287 F.3d 492, 508 (6th Cir. 2002).  However, "in sufficiently pressing circumstances, officers

may use pepper spray to take custody of unarmed suspects." *Id.*  (citing *Monday v. Oullette*, 118

F.3d 1099 (6th Cir. 1997)).  However, the police officer "must have an objective justification" for

the use of pepper spray against an unarmed suspect.  *Id.*  The use of mace on suspects that are

handcuffed and hobbled is clearly excessive. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893,

903 (6th Cir. 2004) (citing *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994); *Vinyard v. Wilson*, 311

F.3d 1340, 1348 (11th Cir. 2002)).

     In this situation, Defendant Battison's actions could be considered unconstitutional.

Plaintiff Rose was unarmed and Defendant Battison never indicated that he thought Plaintiff Rose

might be armed.  Though Defendant Battison believed that Plaintiff Rose had twice fled from the

police, he now had Plaintiff Rose cornered in the room.  Plaintiff Rose said that Defendant

Battison had his arms when he sprayed the mace and Plaintiff Rose had made no effort to take them back. (Rose Dep. at 62). Defendant Battison testified that Plaintiff Rose never tried to get away from him during the arrest. (Tr. at 28).

       B.    Use of Objectively Reasonable Force

Since as the Court decided that Defendant Battison could have violated Plaintiff Rose's constitutional right to be free of excessive force, the analysis moves to the second part of the inquiry to decide "whether this general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances this officer faced." *Saucier*, 533 U.S. at 207-08. To determine if a right to be free from a certain type of excessive force is clearly established the relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. To make this determination, the Court must decide "*what the officer reasonably understood his powers and responsibilities to be*, when he acted, under clearly established standards." *Id.* at 208 (emphasis added).

Ultimately, the question is whether the officer's actions were objectively reasonable in view of the particular facts and circumstances with which he was confronted considering that police officers must often make split-second decisions under circumstances that are "tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. at 397. Relevant circumstances to the inquiry are (1) the severity of the crime at issue, (2) the immediate threat the suspect poses to the safety of the officer or others, (3) the suspect's resistance, if any, and (4) the possibility of flight. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004) (citing *Graham*, 490 U.S. at 396). Notably however, "[c]ourts have consistently concluded that using pepper spray is reasonable . .

24

. where the plaintiff was either resisting arrest or refusing police requests." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002).

Considering all of the circumstances in this case, Defendant Battison's use of mace was objectively reasonable. The first two *Dunlap* factors - possibility of flight and the underlying offense - do not support Defendant Battison's use of mace on Plaintiff Rose. Defendant Battison may have believed that Plaintiff Rose could escape since Defendant Battison believed that Plaintiff Rose fled from police officers twice - once from Defendant Davis at the traffic stop and once from Officer Battison on the driveway. (Rose Dep. at 36, Tr. at 23-24, 26-27). However, at the time of the arrest Plaintiff Rose was backed into a basement room, diminishing the possibility of flight. Additionally, the underlying offenses - traffic violations - are not serious or violent.

However, the Court recognizes that Defendant Battison would have had immediate and serious concern about both his own safety and Plaintiff Rose's struggles to stand up. This incident occurred in a basement room where Defendant Battison was outnumbered by Plaintiff Rose, Plaintiff Seibert and Tommy. In the heat of the moment, Defendant Battison would not have known if Plaintiff Seibert and Tommy would come to Plaintiff Rose's aid, at least not until Plaintiff Seibert told Plaintiff Rose to stop resisting. (Rose Dep. at 68). Secondly, Defendant Battison reasonably could have believed that even though Plaintiff Rose was not actively trying to prevent Defendant Battison from handcuffing him, Plaintiff Rose was not subdued and was struggling with Defendant Battison by attempting to stand up. (*Id.* at 61-62, 67; Tr. at 28). Plaintiff Rose acknowledges that Defendant Battison told him to stop resisting several times. (Rose Dep. at 62, 63). Defendant Battison would not have known that Plaintiff Rose's resistance to being pushed down on the desk was instinctual, as Plaintiff Rose claims. Nor would Defendant Battison have assumed that Plaintiff Rose was caught off guard since Defendant Battison told

25

Plaintiff Rose that he was under arrest before he allegedly lunged at Plaintiff Rose. (*Id.* at 61). In addition, the struggle lasted longer than the moment that an instinctual response would last. (*Id.* at 61).

Moreover, Defendant Battison did not use his mace initially. He first tried to simply handcuff Plaintiff Rose until Plaintiff Rose began rearing up. (*Id.* at 61-62). Although Plaintiff Rose did not attempt to pull his hands away, Defendant Battison was not able to handcuff Plaintiff, until Defendant Battison used his mace and Plaintiff Rose stopped struggling. (*Id.* at 63; Tr. at 28). The Court finds no implication that Defendant Battison used an excessive amount of mace or that he maced Plaintiff Rose after he was handcuffed and subdued. In fact, if a police officer was not permitted to use mace in a situation such as this, the officer possibly would need to use more dangerous types of non-lethal force in order to subdue a suspect. As it was, Plaintiff Rose was not physically injured by Defendant Battison's use of force. (*Id.* at 76). In light of these facts, the Court concludes that Defendant Battison's use of pepper spray was reasonable under these circumstances. Therefore, Defendant Battison is entitled to qualified immunity as to Plaintiff Rose's excessive force claim.

## V.    Defendant Police Officers Removal of Plaintiff Rose's Property

Defendants next move for summary judgment on plaintiffs' unconstitutional seizure of property claim, arguing that Defendant Davis is entitled to qualified immunity as to this claim. Defendants claim that since Plaintiff Rose's car had expired license plate tags, Defendant Davis was entitled to impound the vehicle under Cincinnati Municipal Code section 513-1(6) which provides that "[a]ny police officer may impound and cause to be towed any motor vehicle . . . which does not display currently valid license plates . . ."[6] (Doc. 29 at 9).

---

[6] Defendant Davis never claims that Plaintiff Rose's car was towed because Plaintiff Rose was driving with expired tags.

Seizure of property under the Fourth Amendment "occurs when there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Since the fourth amendment has a reasonableness standard, the plaintiff must show that the seizure of property was objectively unreasonable to recover under § 1983. *Luster v. City of Gallatin*, 50 Fed. Appx. 189, 191 (6th Cir. 2002) (citing *Soldal*, 506 U.S. at 71). A police officer may seize property in a public place if the item is evidence of a crime and the fourth amendment standards are satisfied. *Soldal*, 506 U.S. at 68 (1992) (citing *Payton v. New York*, 445 U.S. 573, 587 (1980)).

In *Colorado v. Bertine*, the Supreme Court refuses to consider an argument not raised in the lower courts that the police unconstitutionally seized the defendant's car. *Colorado v. Bertine*, 479 U.S. 367, 375 (1987). However, the Court commented on the degree of discretion the police are permitted to exercise in depriving a person of property. The police in this case were subject to departmental regulations which provided that when a suspect is arrested, the suspect's car may either be impounded or parked and locked in a public lot. *Id*. The Court notes that when the police have discretion to either lock and leave a car or impound the car, the police may take either option. But the police officer's discretion must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id*. Therefore, under *Bertine*, if the police have discretion as to whether or not follow a particular course of action in depriving an individual of property, they must exercise their authority "according to standard criteria" in order for the seizure to pass constitutional muster.

CMC 513-6, the statute under which Plaintiff Rose's car was impounded, provides police officers with authority to impound cars without valid license plates. Since the police followed this ordinance when they asked Plaintiff Seibert and Tommy to move Plaintiff Rose's car to the street

and then had Plaintiff Rose's car impounded, the seizure of Plaintiff Rose's car was lawful. However, this ordinance on its face cannot possibly be the policy of the City of Cincinnati Police Department. Literally construed, the Cincinnati ordinance allows police officers to impound any car without a valid license plate from any location in the city in any state of repair. There are three reasons why the Cincinnati policy cannot enforce this statute literally. First, if police officers were permitted to tow and impound any car without valid tags on private property, no one could work on fixing up a dilapidated car in their garage or driveway unless the car has valid tags or the police officer passing by could just decide to impound the car. Secondly, proprietors of junkyards and car dealerships would have to make sure that each and every car on their lots have valid plates and tags. Finally, the Court doubts that the Ohio legislature intended this result under the licensing fee statute. That statute only requires owners of vehicles operating on public roads and highways to pay an annual licensing tax. Ohio Rev. Code Ann. § 4503.02.

Since this law plainly cannot be applied literally, the Cincinnati Police Department must have a policy to guide the conduct of police officers under this ordinance. Defendant Battison and Defendant Davis both state what they believe to be the policy of the police department in this case. Defendant Battison says Cincinnati police officers do not remove cars from private driveways and place them on streets so that the car can be impounded. Defendant Davis says cars can be removed from city streets if the tags are expired by more than 30 days. However, Defendant Davis says nothing about the issue at hand: when and if a police officer is permitted to order a private citizen to move a car from private property onto a public street and impound the car for being parked on a public street with tags expired by more than 30 days. Defendant Davis only says that police are permitted tow cars from private driveways, but that is not what happened in this case - Defendant Davis told the Seiberts to move the car onto a public street. Then Defendant Davis

28

impounded the car for being parked on a public street. Since Defendant Davis' "policy" does not address the issue at hand, the only possible policy under which he could have operated, was the policy stated by Defendant Battison.

However, the Court is not in a position to determine which policy applies in this case. Of the "policies" before us, arguably only Defendant Battison's policy should apply. However, the only controlling policy is the City of Cincinnati Police Department's written policy. No party has submitted this policy to the Court. The Court only has before it various police officer's interpretations of this policy. Therefore, the Court must allow the jury to decide what policy controls. The defendants' motion for summary judgment as to Plaintiff Rose's claim that Defendant Davis violated Plaintiff Rose's right to be free from unreasonable seizures is denied.[7]

## VI.    John Doe Claims

### A.    Defendant Battison and Davis' Motion for Summary Judgment on all Claims against Defendant John Does I-XX, Police Officers.

Defendants Davis and Battison assert that John Does I-XX, Police Officers are entitled to summary judgment on Plaintiffs' § 1983 claims that the John Does violated Plaintiff Seibert's constitutional right to be free from warrantless and unreasonable searches and Plaintiff Rose's constitutional right to be free from unreasonable seizures, an unreasonable use of excessive force during an arrest, and the unreasonable seizure of property.

The Plaintiffs have not identified any of the John Doe defendants, with one possible exception. In Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. 31), the

---

[7] The Defendants did not move for summary judgment for Defendant Battison on this claim. However, the plaintiff's name him as a defendant for this claim in their complaint, state in their Response Brief that Defendant Battison was involved in the suit and have proffered evidence in the form of the trial testimony of Defendant Battison that Defendant Battison was involved in causing Plaintiff Rose's car to be towed. (Doc. 41 at 4-5).

Plaintiffs set forth a series of "incorrect facts, important omissions, improperly evidenced arguments, and conduct interpretations" given by defendants in their Motion for Summary Judgment. (Doc. 31 at 2-6). One of these statements identifies Officer Beasley as a person that Defendant Davis testifies may have spoken with the Seiberts about moving Plaintiff Rose's car from the driveway to the street. (*Id.* at 3). Presumably, by this statement the Plaintiffs meant to identify Officer Beasley as a John Doe Defendant who participated in seizure of Plaintiff Rose's car even if they have not formally ask the Court leave to amend their complaint to add him to their suit. Officer Beasley will be labeled John Doe I.

The Defendant Police Officers have not cited any authority for the Court's ability to grant summary judgment on the Defendant's motion for summary judgment in favor of an unidentified third party. This Court is unaware of any authority allowing it to grant summary judgment against parties that have not even been properly noticed and summoned. Therefore, the Court will deny Defendant Police Officer Battison and Davis' Motion for Summary Judgment in favor of John Does 1-XX, Police Officers.

B.   Dismissal of John Does I-XX, Police Officers, From this Suit.

However, since the Defendant Officers Battison and Davis have raised the issue of dismissing unidentified parties from this proceeding, the Court will, *sua sponte*, consider whether these John Doe parties should be dismissed from the suit. The Court would normally hesitate to raise this issue *sua sponte* without briefing from the parties, but will do so anyway for two reasons. First, the plaintiffs were put on notice by defendants' motion for summary judgment that the unidentified police officers, for all intents and purposes, could be dismissed from the suit. Discovery is closed. Plaintiffs have had ample time to identify these parties in discovery and petition the court to amend the complaint to add the John Doe parties to this suit. But Plaintiffs

failed to ever ask leave to amend. Secondly, the law in this area establishes a very high burden for Plaintiffs to add parties to this suit after the statute of limitations expires. Plaintiffs cannot meet this burden.

Under Ohio law, § 1983 actions arising in Ohio must be filed within two years from the date of their accrual. *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989) (en banc). The actions which gave rise to the Plaintiffs' Complaint occurred on April 22, 2000. The Plaintiffs filed the Complaint on April 19, 2002, approximately three days prior to the expiration of the statute of limitations. As of this date, Plaintiffs have not filed an amended complaint naming the individual John Doe Police Officers.

If plaintiffs had moved to add John Doe Defendants to this suit, the Court would consider that motion as a motion to amend the complaint. The trial court has discretion to grant or deny a party's motion for leave to amend a complaint pursuant to Fed. R. Civ. P. 15(a). Leave to amend a complaint should be liberally granted. The Court may deny the motion to amend where the complaint, as amended, could not withstand a motion to dismiss. *Matthews v. Jones*, 35 F.3d 1046, 1050 (6th Cir. 1994); *Thiokol Corp. v. Dept. of Treasury*, 987 F.2d 376, 383 (6th Cir. 1993); *Neighborhood Development Corp. v. Advisory Council on Historic Preservation, Department of Housing and Urban Development, City of Louisville*, 632 F.2d 21, 23 (6th Cir. 1980). The Court should also consider factors such as undue delay, bad faith or dilatory motive on the part of the movant, the repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment. *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir. 1994). Leave to amend the complaint to add a new party should be denied where substantial prejudice would result to the opposing parties.

31

*See Foman v. Davis,* 371 U.S. 178, 182 (1969); *Janikowski v. Bendix Corp.,* 823 F.2d 945, 951-52 (6th Cir. 1987).

Under Fed. R. Civ. P. 4(m), the Court could, for good cause shown, permit Plaintiffs to amend their complaint to name and effect service upon the John Doe Police Officers. However, at this juncture, an amended complaint would be filed outside of the applicable limitations period. Therefore, unless the amended complaint relates back to the original, timely filed, complaint, any action by Plaintiffs against the John Doe Police Officers is time-barred.[8]

The relation back issue is governed by Fed. R. Civ. P. 15(c), which provides in pertinent part:

> (c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Because the substituting of named defendants for "John Doe" defendants is considered a change in parties, not a mere substitution of parties, the requirements of Fed. R. Civ. P. 15(c), must be met in order for the amendment adding the named defendant to relate back to the filing of the

---

[8] Rule 4(m) provides, in pertinent part, as follows:
If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

original complaint. *See Cox v. Treadway*, 75 F.3d 230 (6th Cir. 1995). Under Rule 15(c)(3)(B), an amended complaint which adds a new defendant relates back to the original complaint only if the newly-named defendants "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [him]." Plaintiff's lack of knowledge of the names of the unknown officers is not such a mistake. *See Force v. City of Memphis*, NO. 95-6333, 1996 WL 665609 (6th Cir. 1996) (citing *Worthington v. Wilson*, 8 F.3d 1253, 1256-57 (7th Cir. 1993)). For this reason, the Court finds that permitting plaintiffs to amend their complaint to identify the John Doe II-XX police officers and to effect service upon them would be futile and that Plaintiffs' § 1983 action against these officers is time-barred.

John Doe I, Officer Beasley, may have had constructive notice of this lawsuit within 120 days of the service of the summons and complaint. *See Berndt v. State of Tennessee*, 796 F.2d 879 (6th Cir. 1986). In *Berndt*, the court held that a trial court may consider several factors in determining whether a defendant had constructive notice: 1) whether the new defendant allegedly committed the unconstitutional acts; 2) whether the new defendant worked for the original defendant; 3) whether the new and original defendants are represented by the same counsel; 4) whether the plaintiff is incarcerated; and 5) whether the plaintiff is proceeding pro se. *Id.* at 882-84. The third and fourth factors do not impact the Court's analysis - Officer Beasley presumably could choose his own counsel and there is no evidence before this Court that he is currently represented by any counsel participating in this proceeding and Officer Beasley is not incarcerated. However, the second factor suggests that Officer Beasley may have known that the suit was proceeding and that he could be named in the suit. Officer Beasley works for the City of Cincinnati, a defendant in this lawsuit. Therefore, Officer Beasley may have known about this suit.

33

The first and fourth factors strongly suggest that Officer Beasley should not be added to this suit as a defendant. At Plaintiff Rose's criminal trial, Defendant Davis testified that Officer Beasley may have participated in the seizure of Plaintiff Rose's car. However, Plaintiff Rose's criminal trial occurred before April 19, 2002. The Court presumes that Plaintiff Rose was present at his own criminal trial to hear Defendant Davis mention of Officer Beasley and that Plaintiff Rose had or could have had access to a copy of his trial transcript in which the court reporter recorded Defendant Davis' comment. Therefore, if the plaintiffs wanted to bring suit against Officer Beasley based on Defendant Davis' trial testimony, they would have been able to identify him at the time they filed the Complaint. Additionally, though the Plaintiffs currently proceed on a *pro se* basis, the Plaintiffs were represented by counsel when this complaint was filed.[9] For these reasons, the Court finds that permitting plaintiffs to amend their Complaint to identify the John Doe I as Officer Beasley and to effect service upon him would be futile and that plaintiffs' § 1983 action against this police officers is time-barred. In summation, the Court recommends that John Doe Defendants I-XX be dismissed from this lawsuit.

## STATE LAW TORT CLAIMS

Defendant Police Officers Davis and Battison also move the Court for summary judgment in their favor as to plaintiffs' tort claims. In their Motion for Summary Judgment, Defendant police officers ask the Court to grant summary judgment on claims never brought by Plaintiffs for incidents arising out of the initial stop of Plaintiff Rose and the seizure of Plaintiff Rose's car. (Doc. 32 at 23). However, Plaintiffs limited their tort claims to Defendants' conduct during the search of Plaintiff Seibert's house and the arrest and macing of Plaintiff Rose. (Doc. 1 at ¶¶ 24,

---

[9] While Rule 15(a) is designed specifically to avoid the injustices that may occur when unrepresented parties knock on the courthouse door, it is presumed that these plaintiffs, through the benefit of counsel, were cognizant of the Federal Rules of Civil Procedure and the rules discussed within this report.

28). The Court will not make findings concerning state law immunity as to claims not brought by Plaintiffs.

The Defendants argue that they are immune from suit under Ohio Rev. Code Ann. § 2744.03(A)(6). This Ohio statute provides that

> [T]he employee is immune from liability unless one of the following applies:
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

Plaintiffs do not directly address the issue of state law immunity in their Response to Defendants' Motion for Summary Judgment. Plaintiffs allege nothing directly or indirectly in their Response that could even possibly argue that Officers Battison and Davis acted outside of the scope of their employment or official responsibilities. Therefore, the Defendant police officers are not divested of the statutory presumption of immunity under grounds that they were acting outside of the scope of their employment or official responsibilities.

However, in their Response, Plaintiffs do proffer facts drawn from depositions of Plaintiffs and the transcription of Plaintiff Rose's criminal trial which could be construed broadly to mean that Plaintiffs argue that the Defendants' actions "were with malicious purpose, in bad faith, or in a wanton or reckless manner." Therefore, the Court will consider whether or not an exception applies to Defendants Davis and Battison's statutory qualified immunity under § 2744.03(A)(6)(b).

The Fourth Appellate District of Ohio succinctly defined the terms "malicious purpose," "bad faith," "wanton," and "reckless" contained in § 2744.03(A)(6)(b) as follows:

35

> "Wanton" misconduct refers to a failure to exercise any care whatsoever. *Fabrey v. McDonald* (1994), 70 Ohio St. 3d 351, 356, 639 N.E.2d 31; *Hawkins v. Ivy* (1977), 50 Ohio St. 2d 114, 363 N.E.2d 367, syllabus. "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill* (1990), 53 Ohio St. 3d 102, 104-05, 559 N.E.2d 705 (quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500). The term "malice" is the "willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Hicks v. Leffler* (1997), 119 Ohio App. 3d 424, 428-29, 695 N.E.2d 777. "Bad faith" implies sinister motive and also refers, by way of analogy to insurance law, to that which has "no reasonable justification." *Id*. at 429 (quoting *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St. 3d 552, 554, 644 N.E.2d 397).

*Lutz v. Hocking Tech. College*, 1999 Ohio App. LEXIS 2360 (4th App. Dist. 1999).

When Defendant Battison searched Plaintiff Seibert's house, he exercised care to enter with permission, and to proceed down the stairs with permission. (Seibert Dep. at 8-10, 14-15; Tr. at 27, 30-31). No evidence suggests that Defendant Battison sought to cause Plaintiff Seibert harm by searching his house or that Defendant Battison had a sinister motive or acted without justification during the search. In fact, Defendant Battison had justification to search the house - he was looking for a suspect whom Defendant Battison believed had fled twice from the police that he observed running into Plaintiff Seibert's house. (Tr. at 22-27). Plaintiffs have not shown that any § 2744.03(A)(6)(b) exceptions apply to the search of Plaintiff Seibert's house. Thus, Defendant Battison is entitled to statutory immunity as to Plaintiffs' state law claims arising from the search of Plaintiff Seibert's house.

Defendant Battison also is entitled to statutory immunity as to Plaintiffs state law claims arising from his arrest of Plaintiff Rose. As described above, Defendant Battison was entitled to arrest Plaintiff Rose for failing to follow a police officer signal and for committing traffic violations. (*See infra* pp. 9-10). Nothing in the evidence before the Court even suggests that this decision was made "were with malicious purpose, in bad faith, or in a wanton or reckless manner."

Finally, Defendant Battison is entitled to statutory immunity as to state tort claims based on his use of force on Plaintiff Rose. Defendant Battison used a reasonable amount of force in trying to handcuff and subdue Plaintiff Rose. (*See infra* pp. 15-16). Defendant Battison used mace only after 1) the struggle continued for some moments and 2) he warned Plaintiff Rose to desist. (Rose Dep. at 61-63). Since Defendant Battison exercised care in spraying the mace, the Court finds that his behavior was not wanton. (*See infra* p. 16). The use of mace was not reckless - a small burst of mace in the arrest of a suspect who a police officer believes has twice fled from the police and is not fully subdued hardly creates an unreasonable risk of harm. During the arrest, Defendant Battison sprayed mace at Plaintiff Rose and physically twisted Plaintiff Rose around. Since Defendant Battison's use of force in arresting Plaintiff Rose was both lawful and justified by the circumstances consequently, the Court finds that his behavior was not malicious. In addition, Plaintiff Rose was not subdued when Defendant Battison was attempting to handcuff him and place him under arrest. Because of Plaintiff Rose's actions, Defendant Battison had a reasonable justification for using the amount of force that he did on Plaintiff Rose. (*Id.*). Therefore, the Court finds that Defendant Battison did not act in bad faith when arresting Plaintiff Rose. In sum, Defendant Battison did not arrest or use force against Plaintiff Rose with "malicious purpose, in bad faith, or in a wanton or reckless manner" under § 2744.03(A)(6)(b). Accordingly, Defendant Battison is entitled to summary judgment in his favor as to plaintiffs' state law claims for incidents arising out of the arrest and use of force against Plaintiff Rose.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Defendant Davis' motion for summary judgment should be GRANTED as to Plaintiff Rose's claim that Defendant Davis unconstitutionally seized his person during the traffic stop if he indeed makes this claim.

2.  Defendant Battison's motion for summary judgment should be GRANTED as to Plaintiff Seibert's claim that Defendant Battison unconstitutionally searched his house.

3.  Defendant Battison's motion for summary judgment should be GRANTED as to Plaintiff Rose's claim that Defendant Battison unconstitutionally seized Plaintiff Rose.

4.  Defendant Battison's motion for summary judgment should be GRANTED as to Plaintiff Rose's claim that Defendant Battison unconstitutionally used excessive force in arresting Plaintiff Rose

5.  Defendant Davis' motion for summary judgment should be DENIED as to Plaintiff's Rose's claim that Defendant Davis unconstitutionally seized Plaintiff Rose's property.

6.  Defendants Davis and Battison's motion for summary judgment on behalf of John Does I-XX, Police Officers be DENIED.

7.  John Does I-XX, Police Officers be DISMISSED from this suit.

8.  Defendant Davis and Battison's motion for summary judgment should be GRANTED as to Plaintiffs' state law claims arising out the search of Plaintiff Seibert's house, the seizure of Plaintiff Rose, and the alleged use of excessive force against Plaintiff Rose.

Date: 3/28/05

Timothy S. Hogan
United States Magistrate Judge

38

# NOTICE

Attached hereto is the Report and Recommended decision of The  Honorable
Timothy S. Hogan, United States Magistrate Judge, which was filed on  **3-28-05** .
Any party may object to the Magistrate's findings, recommendations and report
within ten (10) days after being served with a copy thereof or further appeal is
waived.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also* Fed. R.
Civ. P. 72(b).  Such parties shall file with the Clerk of Court, and serve on all
Parties, the Judge and the Magistrate, a written Motion to Review which shall
specifically identify the portions of the proposed findings, recommendations or
report to which objection is made along with a memorandum of law setting forth
the basis for such objections.  (Such parties shall file with the Clerk a transcript of
the specific portions of any evidentiary proceedings to which an objection is made).
In the event a party files a Motion to Review the Magistrate's Findings,
Recommendations and Report, all other parties shall respond to said Motion to
Review within ten (10) days after being served a copy thereof.  *See* Fed. R. Civ. P.
72(b).